Hillsborough-northern judicial district
No. 2008-445

THE STATE OF NEW HAMPSHIRE

v.

CHRISTOPHER HOWE

Argued: September 23, 2009
Opinion Issued: November 17, 2009

*Kelly A. Ayotte*, attorney general (*Thomas E. Bocian*, assistant attorney general, on the brief and orally), for the State.

*Pamela E. Phelan*, public defender, of Manchester, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Christopher Howe, was found guilty of six counts of possession of child pornography, *see* RSA 649-A:3, I(e) (2007) (amended 2009), following a jury trial in the Superior Court (*Barry*, J.). He appeals, arguing that the trial court erred by admitting certain evidence. We affirm.

The record supports the following. The defendant, Nathan and Jennifer Greenlaw, and Frank and Tammy Turner knew each other through the Granite State Dart League. In early June 2006, the Turners rented a bedroom in their apartment to the defendant for $50 a week. The defendant did not have access to the Turners' computer because it was password protected. When he wanted to use a computer, the defendant would visit the Greenlaws to use theirs. The Turners also had permission to use the Greenlaws' computer. Mr. Greenlaw acknowledged that he saw pop-up advertisements for pornographic websites when he used his computer, but denied ever visiting a pornographic website, printing material from a pornographic website, or downloading a pornographic image.

On June 23, 2006, Ms. Turner asked the defendant to leave because he had not paid any rent. She told him he had seven days to remove his

belongings before she would throw them away. The defendant returned to the Turners' apartment twice between June 24, 2006, and June 26, 2006, to remove his belongings. He removed his clothing, television and a stereo, but left behind a bureau, bed and part of a computer stand. He then left for a vacation with the Greenlaws in Virginia. He did not contact the Turners again before leaving, and did not return to the Turners' apartment.

On July 4, 2006, Ms. Turner and her sister cleaned out the room the defendant had rented. In one of the bureaus the defendant left behind, they discovered CDs, memory cards, identification badges and a manila folder. The manila folder contained twenty-three images that appeared to have been generated by a computer printer. Two of the images depicted adult females, and the other twenty-one depicted female children in sexually provocative poses.

Ms. Turner called the police. The Manchester Police Department responded to the Turners' apartment and took the manila folder containing the pornography, the identification badges, some papers they found in the bureau and five CDs. Three of the CDs were not labeled, one was labeled "Babysitter" and another was labeled "PTCH Vicky." At the police station, Detective Richard Nanan inserted the CD entitled "PTCH Vicky" into his computer and found that it contained six video clips depicting children engaged in sexual activity.

On July 9, 2006, Detectives Nanan and Craig went to the Greenlaws' residence where the defendant had been staying and asked him to come to the police station to answer questions. He agreed. During the ensuing interview, the defendant admitted to police that he owned one CD titled "Babysitter" and another titled "Naughty America," but denied knowing anything about the pornographic images found in the manila folder. He told the officers he had used the Greenlaws' computer without their knowledge to download "Babysitter" and "Naughty America" from a file sharing website. The detectives returned to the Greenlaws' apartment and, with their permission, brought their computer back to the police station for analysis.

Detective Craig analyzed the Greenlaws' computer using a forensics tool kit, or FTK. This FTK report revealed that the Greenlaws' computer had been used to access child pornography websites such as "Exploited Teens." He also discovered several "graphic images" in temporary Internet files on the computer. Craig characterized some of the images as child erotica and others as child pornography. The images on the Greenlaws' computer contained the same type of images found in the manila folder and on the CDs from the Turners' apartment. He determined that all of the images and websites were accessed between June 2, 2006, and June 23, 2006.

The police also compared a fingerprint found on one of the images in the manila folder with those contained on a fingerprint card from the defendant's arrest in 2004. Two latent print examiners at the state forensics laboratory concluded that the print on the image matched the defendant's right index fingerprint from the fingerprint card. No fingerprints were found on the CDs.

At trial, a digital image expert testified that the images in the manila folder depicted real children. The State introduced more than thirty pages of the images found on the Greenlaws' computer.

Two of the six indictments with which the defendant was charged alleged possession of the photographs found in the manila folder. The remaining four indictments alleged possession of video files found on the CD labeled "PTCH Vicky." The defendant was convicted of all six counts of possession of child pornography. On appeal, he argues the trial court erred when it admitted: (1) the fruits of the search of the CDs; (2) the 2004 fingerprint card; and (3) the pornographic material obtained from the Greenlaws' computer.

*I. Videos from the CD*

Before trial, the defendant moved to suppress the CD labeled "PTCH Vicky," arguing it was obtained by an unreasonable search and seizure in violation of his right to privacy under Part I, Article 19 of the New Hampshire Constitution and the Fourth Amendment to the United States Constitution. Specifically, he argued that because he did not abandon his interest in the contents of the bureau, the police should have obtained a search warrant before viewing the contents of the CD. The State contended that the property had been abandoned because the defendant was given ample opportunity to remove his belongings and he did not do so. The trial court denied the motion to suppress because the defendant had no expectation of privacy in the bureau or its contents because he voluntarily abandoned the property.

 We first address the defendant's claim under the State Constitution, and cite federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983). Under Part I, Article 19 of the New Hampshire Constitution, a person has the "right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions." *State v. Westover*, 140 N.H. 375, 379 (1995); *see also* N.H. CONST. pt. I, art. 19. In determining whether a search or seizure was reasonable, we will analyze whether the person had a reasonable expectation of privacy in the evidence seized. *See Katz v. United States*, 389 U.S. 347, 353 (1967); *State v. Goss*, 150 N.H. 46, 48-49 (2003). In *Goss*, we adopted a two-part reasonable expecta-

tion of privacy analysis under Part I, Article 19. *Goss*, 150 N.H. at 49. First, a person must "have exhibited an actual (subjective) expectation of privacy," and, second, that expectation must "be one that society is prepared to recognize as 'reasonable.'" *Id.* Absent an invasion of the defendant's reasonable expectation of privacy, there has been no constitutional violation. *Id.*

"When a person abandons a possession . . . he or she gives up the right to be secure from unreasonable searches of that possession." *Westover*, 140 N.H. at 380; *see also Abel v. United States*, 362 U.S. 217, 241 (1960). Abandonment is determined "based upon evidence of a combination of act and intent." *Westover*, 140 N.H. at 380. Intent "is to be ascertained from what the actor said and did since intent, although subjective, is determined from objective facts at hand." *Id.* Also relevant are "where and for what length of time the property is relinquished and [its] condition." *Id.*

Whether property has been abandoned is generally a question of fact. *Id.* Therefore, we will uphold the fact finder's determination regarding abandonment unless it is clearly erroneous. *Id.* Our review of the trial court's legal conclusions, however, is *de novo. State v. Sullivan*, 157 N.H. 124, 129 (2008).

We cannot say the trial court's conclusion that the defendant abandoned the room and its contents was clearly erroneous. Ms. Turner told the defendant that he needed to move out and gave him one week to remove his belongings. He returned to the apartment twice within one week to remove his clothing, and several larger items such as a television and stereo. This demonstrates that the defendant knew he had only one week to remove his property and he was complying with Ms. Turner's order.

In addition, at no point during his second visit did he indicate to the Turners that he would be returning to take the remaining property. After returning to the Turners' apartment for the second time, the defendant had no further contact with them. He neither requested more time nor left a forwarding address at which the Turners could contact him regarding the rest of his belongings. Ms. Turner waited an additional five days beyond her original seven-day deadline before she began going through his things. The fact the defendant appeared to have lived elsewhere for approximately two weeks without them indicated that he did not need these items. The defendant's actions demonstrate a clear intent to abandon the bedroom, including the bureau and the CDs therein.

The defendant argues that he only temporarily abandoned his property, including the CD. *See Westover*, 140 N.H. at 380-81. We disagree. The defendant left his belongings in the apartment for five days after the

expiration of Ms. Turner's deadline; twelve days lapsed from the time Ms. Turner told him to leave and the time she searched his room. Federal courts have found less time to be enough to constitute abandonment. *See, e.g., United States v. Kress*, 446 F.2d 358, 361 (9th Cir.), *cert. denied*, 404 U.S. 947 (1971) (finding abandonment after absence of only two days). As set forth above, the defendant's conduct before and during his absence indicated that he intended to abandon his belongings. Although the defendant asserts that the fact he was vacationing "necessarily implies a temporary rather than permanent absence," the trial court reasonably found the property had been abandoned based upon all of the circumstances. *See Westover*, 140 N.H. at 380 (abandonment determined from objective facts at hand).

The defendant also relies on *Goss*, where we held that a defendant has an expectation of privacy in his trash. *Goss*, 150 N.H. 49-50. *Goss* is inapplicable because the defendant in this case did not remove the bureau or its contents and place them in the trash, which would have ensured that his belongings would be destroyed. Nor did he instruct the Turners to dispose of his property. Ms. Turner told him that she intended to throw away any items remaining after seven days. This reasonably would entail going through the drawers and any property he left behind. Once he moved out and left his belongings in the room, it was, as the trial court stated, "a virtual certainty" that the Turners would go through them. Therefore, the defendant did not have a reasonable expectation of privacy in the items he left behind.

We conclude that under the State Constitution, there was no protected privacy interest requiring the police to obtain a search warrant before viewing the videos on the CD because the defendant had abandoned it. The Federal Constitution provides no greater protection than the State Constitution under these circumstances. *See Goss*, 150 N.H. at 49. Therefore, we reach the same result under the Federal Constitution as we do under the State Constitution.

## II. Fingerprint Card from 2004

Next, we address the defendant's argument that the 2004 fingerprint card was inadmissible hearsay. At trial, the State introduced the fingerprint card through the testimony of Brian Last, a Manchester police officer assigned to the booking department. The trial court admitted the fingerprint card under the business records exception to the hearsay rule. *See* N.H. R. Ev. 803(6). The defendant argues that the State failed to lay the proper foundation that the fingerprint card had been created and kept in the ordinary course of business or that it was the regular practice of the police department to create such fingerprint cards. The defendant contends

that the fingerprint card is inadmissible because Officer Last testified that the first time he saw the 2004 fingerprint card was at trial.

■ "Rule 803(6) requires that the proponent of the document produce the custodian of the record, or another qualified witness, to testify about the identity and mode of preparation of the proffered document, and to testify that it was made in the regular course of business at or near the time of the transaction recorded." *State v. Wall,* 154 N.H. 237, 242 (2006). "Verification of the authenticity, regularity and correctness of such records by the official having them in charge, or by another qualified witness, constitutes the proper foundation for admission of the proffered record." *Id.* (quotations omitted). "The 'qualified witness' required by Rule 803(6) need only be someone who understands the system of how the document was made, and need not have participated in the document's creation or know who created it." *Id.* at 244.

The admissibility of evidence is generally within the discretion of the trial court, and we will uphold its rulings unless the exercise of its discretion is unsustainable. *Murray v. Developmental Servs. of Sullivan County,* 149 N.H. 264, 267 (2003). Unless the defendant establishes that such a ruling was clearly untenable or unreasonable to the prejudice of his case, we will not disturb it. *Id.* The defendant has not met this burden.

Although Officer Last testified that he was not "keeper of the records," he later said that as a booking officer he fully understood the system of how the fingerprint cards were created. *Wall,* 154 N.H. at 244. He testified that he was "familiar with the process of the record-keeping" and had "personal knowledge" of the filing system that stored the fingerprint cards. He then described how the cards were created. He also testified that he had been involved in the creation, storage and retrieval of the fingerprint cards.

■ Officer Last also testified that fingerprint cards were records the department kept in the normal course of business. *Wall,* 154 N.H. at 242. He explained that the 2004 fingerprint card was on the same form that is "the standardized form used by the Manchester Police Department." He then testified that the fingerprint card belonged to the defendant, relying upon information on the card, including the defendant's name and signature. Because Officer Last testified as to the regularity of the creation of the fingerprint cards, as well as the fact that the fingerprint card in issue was of the same type that is usually created when a defendant is booked, he established the proper foundation that the card was created and maintained in the regular course of business under Rule 803(6).

The defendant argues that because fingerprint cards are not created every time a defendant is arrested and booked, they are not business records within the meaning of Rule 803(6). This argument fails, however,

because Officer Last testified that it is the Manchester Police Department's protocol that defendants be fingerprinted and photographed when they are booked. Although Officer Last testified that "[a] lot of officers" will not create a second fingerprint card when one already exists, he also testified the fingerprint cards are created "[m]ost times." The State need not show that the cards are always created upon every arrest, but that they are created in the regular course of business. Officer Last's testimony that it was the regular practice of the Manchester Police Department to fingerprint and photograph defendants upon their first arrest was sufficient to support the trial court's decision to admit the card.

Accordingly, we conclude that the trial court did not unsustainably exercise its discretion by admitting the 2004 fingerprint card.

*III. Additional Images Found on Greenlaws' Computer*

Before trial, the State moved *in limine* to introduce more than thirty pages of pornographic images from the Greenlaws' computer. The defendant argues that: (1) the State failed to demonstrate that the evidence was admitted for a purpose other than character or propensity; (2) the State failed to show clear proof that the defendant was the person who downloaded the images on to the Greenlaws' computer; and (3) the evidence was substantially more prejudicial than probative. The State counters that the images show that the defendant acted knowingly in downloading child pornography, as opposed to adult pornography, and not by accident or mistake.

Although "[e]vidence of other crimes, wrongs, or acts" is inadmissible "to prove the character of a person in order to show that the person acted in conformity therewith," such evidence may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." N.H. R. Ev. 404(b). "The purpose of Rule 404(b) is to ensure that the defendant is tried on the merits of the crime as charged and to prevent a conviction based upon evidence of other crimes or wrongs." *State v. Cook*, 158 N.H. 708, 711 (2009). "We review the trial court's ruling for an unsustainable exercise of discretion, and will reverse only if it was clearly untenable or unreasonable to the prejudice of the defendant's case." *Id.* at 712. Because the trial court ruled on the admissibility of the images before trial, "we consider only what was presented at the pretrial hearing." *State v. Glodgett*, 144 N.H. 687, 694 (2000) (quotations and brackets omitted).

To be admissible under Rule 404(b): "(1) the evidence must be relevant for a purpose other than proving the defendant's character or disposition; (2) there must be clear proof that the defendant committed the

act; and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice to the defendant." *State v. Costello*, 159 N.H. 113, 118 (2009). The State must prove the admissibility of the bad acts. *Id.* Here, the defendant challenges the trial court's decision under all three prongs of the Rule 404(b) analysis. Because the trial court made no findings with respect to any of the three prongs, and the defendant did not object to the lack of findings, we review the record to determine whether it supports the trial court's implicit finding that each prong was met. *But see State v. McGlew*, 139 N.H. 505, 508-10 (1995) (requiring trial courts to make specific findings to support their evidentiary rulings under Rule 404(b)).

■ "[T]o meet its burden under the first prong, the State is required to specify the purpose for which the evidence is offered and articulate the precise chain of reasoning by which the proffered evidence will tend to prove or disprove an issue actually in dispute, without relying upon forbidden inferences of predisposition, character, or propensity." *State v. Kim*, 153 N.H. 322, 327 (2006). "That chain of reasoning must demonstrate a sufficient logical connection between the prior acts and the permissible purpose for which the State offers the evidence." *Costello*, 159 N.H. at 118 (quotations omitted).

■ "To be relevant to intent, evidence of other bad acts must be able to support a reliable inference, not dependent on the defendant's character or propensity, that the defendant had the same intent on the occasions of the charged and uncharged acts." *State v. Pepin*, 156 N.H. 269, 277 (2007) (quotations omitted). "We will find sufficient support for a reliable inference of intent only if the defendant's intent in committing other bad acts and the defendant's intent in the charged offenses is closely connected by logically significant factors." *Id.* (quotations omitted).

■ ■ Here, the defendant was charged with possession of child pornography, which required the State to prove the defendant knowingly possessed a "visual representation of a child engaging in sexually explicit conduct." RSA 649-A:3, I(e). "A person acts knowingly with respect to conduct or to a circumstance that is a material element of an offense when he is aware that his conduct is of such nature or that such circumstances exist." RSA 626:2, II(b). The evidence found on the Greenlaws' computer is probative of the defendant's intent and knowledge because he sought out websites containing child pornography. These websites were accessed repeatedly during the time that the defendant stayed at the Turners' apartment.

■ Evidence that the defendant sought and viewed child pornography on a regular basis is relevant to show the defendant acted "knowingly." *See United States v. Angle*, 234 F.3d 326, 343 (7th Cir. 2000), *cert. denied*, 533 U.S. 932 (2001) (upholding admission of evidence of other acts in child pornography case to show defendant acted "knowingly"); *United States v. Schene*, 543 F.3d 627, 643 (10th Cir. 2008) (upholding admission of uncharged images of child pornography to show defendant "knowingly possessed" charged images).

■ The images were also probative of the defendant's lack of mistake or accident. The defendant told the police that he possessed adult, but not child pornography. The images were relevant to show the defendant sought out child pornography and did not accidentally acquire images of child pornography in pursuit of adult pornography.

■ The defendant next argues that the trial court erroneously admitted the uncharged images under the second prong of the Rule 404(b) analysis because there was no clear proof that he accessed the material. The "clear proof" requirement "is satisfied when the State presents evidence firmly establishing that the defendant, and not some other person, committed the prior act." *State v. Ayer*, 154 N.H. 500, 512-13 (2006), *cert. denied*, 552 U.S. 834 (2007).

■ To establish clear proof, the State presented the FTK report to demonstrate that any and all child pornography websites and images viewed, downloaded, and visited by users of the Greenlaws' computer occurred only during the time that the defendant lived with the Turners. The other people who had access to the computer testified that they never used it to access pornography. In addition, the images found on the Greenlaws' computer were similar to those found in the manila folder and on the CDs. The FTK report and testimony of the witnesses constitute clear proof that the defendant accessed the material found on the Greenlaws' computer.

■ Finally, the defendant argues that the trial court erroneously admitted the uncharged images under the third prong of the Rule 404(b) analysis because there was a substantial danger that the jury would consider the defendant's responsibility for the additional images when deciding his guilt. Under the third prong of Rule 404(b), "evidence of prior bad acts is admissible if the danger of unfair prejudice to the defendant does not substantially outweigh the probative value of the evidence." *State v. Beltran*, 153 N.H. 643, 649 (2006). "Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense of horror, or provoke its instinct to punish, or trigger other

mainsprings of human action that may cause a jury to base its decision upon something other than the established propositions in the case." *Id.* "It is not, however, evidence that is merely detrimental to the defendant because it tends to prove his guilt." *Id.* "Among the factors we consider in weighing the evidence are: (1) whether the evidence would have a great emotional impact upon a jury; (2) its potential for appealing to a juror's sense of resentment or outrage; and (3) the extent to which the issue upon which it is offered is established by other evidence, stipulation or inference." *Costello,* 159 N.H. at 123.

"We accord considerable deference to the trial court's determination in balancing prejudice and probative worth under Rule 404(b)." *Id.* "Particularly pertinent to determining this balance is whether the evidence is relevant to prove an issue that is actually in serious dispute." *Pepin,* 156 N.H. at 278-79.

"First, we consider the probative value of the evidence." *Costello,* 159 N.H. at 123. "Determining the probative value of evidence entails analyzing *how* relevant it is." *Id.* "Relevant evidence may have limited probative value." *Id.* Here, as discussed above, evidence that the defendant used the Greenlaws' computer to access child pornography websites and images was highly probative of his knowledge because the State had to prove every element of the crime at trial, including that the defendant "knowingly" possessed the child pornography.

"Next, we consider whether the danger of unfair prejudice to the defendant from admission of this evidence substantially outweighed its probative value." *Id.* "[W]hile evidence of a prior offense or bad act is always prejudicial, the prejudice is frequently outweighed by the probative value of the evidence when the defendant's knowledge or intent is a contested issue in the case." *Kim,* 153 N.H. at 331. As noted above, the challenged evidence was probative of the defendant's knowledge.

In addition, the evidence from the Greenlaws' computer was not likely to have any greater emotional impact upon the jury than the charged images. Here, the images found on the Greenlaws' computer were the same type of child pornography and child erotica as were found in the Turners' apartment. The jury was also shown portions of the videos found on the "PTCH Vicky" CD and the images found in the manila folder. Although the images may have been prejudicial, we cannot conclude that the evidence "was so inflammatory as to substantially outweigh its probative value." *Costello,* 159 N.H. at 123.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, HICKS and CONBOY, JJ., concurred.